IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LIBERTY AND PROSPERITY 1776, INC., et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>JON CORZINE, et al.,<br><br>　　　　Defendants. | HON. JEROME B. SIMANDLE<br><br>Civil No. 08-2642 (JBS)<br><br>**OPINION** |

APPEARANCES:

Robert Loefflad, Esq.
SETH GROSSMAN & ASSOCIATES
453 Shore Road
Somers Point, NJ 08244
    Attorney for Plaintiffs Liberty and Prosperity 1776, Inc.;
    Seth Grossman; Betty Lou Barnard; Bruce Barkoff; Drew W.
    Barkoff; Robert Bulkeley; Judith Butler; Albert P. Garrett;
    Charles Lukens; Doris Lukens; and John G. Mayher

Larry R. Etzweiler, Senior Deputy Attorney General
Brian G. Flanagan, Deputy Attorney General
OFFICE OF THE NJ ATTORNEY GENERAL
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
    Attorney for Defendants Jon Corzine, Anne Milgram, State of
    New Jersey, and the New Jersey State Police

Judson B. Barrett, Esq.
BARRETT AND PAVLUK, LLC
1602 Lawrence Avenue
Suite 109
Ocean, NJ 07712-2006
    Attorney for Defendants County of Cape May and John F.
    Callinan

A. Michael Barker, Esq.
BARKER, SCOTT & GELFAND
Linwood Greene
210 New Road

```
Suite 12
Linwood, NJ 08221
     Attorney for Defendants Township of Middle; Middle Township
     Chief of Police Joseph Evangelista; and Middle Township
     police officers Paul Fritsch, Scott Webster, James D'Alonzo,
     and Richard Smedberg

Michael Paul Madden, Esq.
MADDEN & MADDEN, PA
108 Kings Highway East
Suite 200
P.O. Box 210
Haddonfield, NJ 08033-0389
     Attorney for Defendants Middle Township Board of Education
     and Walter Landgraf
```

**SIMANDLE**, District Judge:

## I.   INTRODUCTION

This First Amendment case involves individuals who were prevented from carrying signs and distributing leaflets at a state-sponsored town hall meeting by state officials who allowed another nonprofit group to engage in those activities.  The matter is before the Court on a motion to dismiss by Walter Landgraf, a business administrator for the Middle Township Board of Education, who argues that the Complaint's allegations insufficiently plead his involvement in the unconstitutional conduct [Docket Item 69], and former Governor Jon Corzine's motion to dismiss for similar reasons, as well as qualified immunity [Docket Item 79].  Mr. Landgraf joins in Mr. Corzine's motion, also invoking qualified immunity.  For the reasons explained below, the motions will be denied.

## II.  BACKGROUND

### A.  Factual Background

This dispute arises out of events at a town hall meeting convened by then New Jersey Governor Jon Corzine at the Middle Township High School Performing Arts Center on January 19, 2008. (Second Am. Compl. ¶ 42.)  According to Plaintiffs' allegations, Governor Corzine scheduled the town hall meeting to present a financial restructuring and debt reduction plan to the citizens of Middle Township, and to solicit the citizens' feedback regarding the plan.  (Id. ¶ 39.)  Plaintiffs, various individuals who opposed the financial restructuring plan, all of whom are members of Liberty and Prosperity 1776, Inc., allege that Mr. Landgraf and Middle Township police advised them that they could not display signs or distribute literature in the auditorium, and forced them to stop displaying signs and distributing literature on the grounds of the facility generally.  (Id. ¶ 71, 74, 83.) When Plaintiffs Steve Lonegan and Seth Grossman refused to leave or stop displaying signs on the facility grounds, they were arrested.  (Id. ¶ 72, 75.)

Members of a nonprofit organization, Save Our State NJ, Inc., were permitted to set up registration tables inside the Performing Arts Center, distribute literature, display signs, place a banner over the stage, and interact with members of the public, as they had done at previous town hall meetings.  (Id. ¶¶

3

45-46.) Plaintiffs allege facts to show that Save Our State was a private organization indistinguishable from Liberty and Prosperity 1776 except in its viewpoint.  They allege that the State of New Jersey provided no financial support to Save Our State (Id. ¶ 48); Save Our State was registered as a 501(c)(4) advocacy organization with the IRS (Id. ¶ 50); the registered agent and director of Save Our State was Jennifer Godoski, who previously served as an employee in the Commissioner's Office of the New Jersey Department of Transportation, but who severed "all official ties" with the state (Id. ¶¶ 51-52); Save Our State was privately formed for the sole purpose of engaging in political advocacy in furtherance of its individual donor's political and economic interests and not on behalf of the State of New Jersey, and the activities it undertook were for that sole purpose (Id. ¶¶ 55-57, 60); and that the State Of New Jersey exercised no direct control over the activities of Save Our State, and there was no understanding between the State of New Jersey and Save Our State under which Save Our State agreed to aid or assist the State in expressing government speech (Id. ¶¶ 61-62).

Plaintiffs claim that Defendants violated their First Amendment rights by restricting their use of signs and distribution of leaflets while permitting Save Our State's similar speech approving the Governor's plan.  Defendants respond that the restrictions were reasonable, content-neutral

4

restrictions based on the security needs of an event featuring the Governor, which were applied in a viewpoint-neutral manner because Save Our State's speech was in fact government speech. Defendants also justify the restrictions based on the prerogative of the temporary user of public forum to control his message and prevent disruption.

### B.  Procedural History

Plaintiffs filed the first version of the Complaint on May 28, 2008 naming numerous state officials and state entities as defendants.  Plaintiffs initially alleged that Defendants violated their right to the freedom of speech, assembly, and to petition the government in violation of the United States Constitution and the New Jersey Constitution; that Defendants violated Plaintiff Grossman's right to be free from unreasonable searches and seizures in violation of the United States Constitution and the New Jersey Constitution; and asserted claims of civil rights conspiracy pursuant to 42 U.S.C. § 1985 and refusal to prevent a civil rights conspiracy pursuant to 42 U.S.C. § 1986.

By an Order and Opinion of March 3, 2009, this Court dismissed with prejudice Plaintiffs' claims against the state entities and the individual state officials in their official capacities because of Eleventh Amendment immunity, as well as the

claims other than the free speech claims.

The Court also examined Plaintiffs' free speech claims. Defendants had moved to dismiss these claims, arguing that they failed to state a claim because of the First Amendment's allowance for content-neutral time, place, and manner restrictions.  In particular, they pointed to security interests and the prevention of disruption as sufficient justifications for a content-neutral restriction on signs and distribution of literature.  In their opposition to the motion, Plaintiffs had submitted a certification of Plaintiff Seth Grossman containing allegations of facts related to Save Our State which were not mentioned in the Complaint, and which Plaintiffs believed supported a claim of viewpoint discrimination.  (Grossman Cert. ¶¶ 53-54.)  In response to the certification, Defendants argued that the speech of Save Our State was government speech, and therefore could lawfully be treated differently from Plaintiffs' speech.

The Court found that if Plaintiffs desired to pursue a claim based upon a theory of viewpoint discrimination, they needed to file an amended complaint clarifying the nature of their claims, and with factual allegations supportive of each such theory.  The Court also required that in their amended complaint, Plaintiffs had to specify which Defendants were alleged to have engaged in which conduct because the Complaint simply referred to Defendants

collectively.

The Amended Complaint failed to remedy the problem of collective pleading, and stated many claims using legal boilerplate, such as that a defendant "personally participated in" unconstitutional conduct without specifying the nature of the participation.  The Court dismissed the Amended Complaint without prejudice to further amendment, ordering that to prevent the recurring ambiguity, any paragraph of the Second Amended Complaint that contained collective reference to Defendants would be taken to apply to all Defendants, and such allegations needed to comply with Rule 11, Fed. R. Civ. P.  Similarly, the Court warned that any paragraph of the Second Amended Complaint that claimed that one or more individuals was involved in unconstitutional conduct and then referred to a list of allegedly unconstitutional actions, (e.g. Am. Compl. ¶¶ 65-74), would be construed as an allegation that each of the individuals was personally involved in every action listed.

The Court also found that the Amended Complaint still did not provide adequate factual allegations with respect to the relationship between Save Our State and Defendants needed for this Court to assess whether Save Our State had engaged in private or government speech.  Plaintiffs were asked to clarify their factual allegations with regard to whether and to what extent Defendants controlled the content of the expressive

activity of Save Our State, and clarify the purpose for the creation of the organization.

The Second Amended Complaint was filed on November 2, 2009. It deletes a number of parties, retaining claims against former Governor Jon Corzine, three members of the Middle Township Police Department (Paul Fritsch, James D'Alonzo, and Richard Smedberg) and Secretary of the Middle Township Board of Education, Walter Landgraf, as well as a number of unnamed defendants.  It also adds a fourth Middle Township policeman, Ronald Miller Jr.

The Second Amended Complaint offers more specific allegations with respect to the involvement of each Defendant, and it clarifies Plaintiffs' allegations regarding the relationship between the State of New Jersey and the nonprofit organization Save Our State.

Governor Corzine's renewed motion to dismiss argues that the Governor is entitled to qualified immunity because Save Our State was, or he could have reasonably believed it was, expressing government speech, and that therefore the restrictions on signs and leaflets were permissible.  He also argues that the Complaint fails to allege his personal participation in the speech restrictions, and that it therefore must be dismissed on that independent basis.  Mr. Landgraf joins these arguments, and argues that his carrying out the orders of the Governor's security team is an insufficient factual basis for his personal

liability.

## III.  DISCUSSION

### A.  Standard of Review

The sufficiency of pleadings in federal court is governed by Rule 8, Fed. R. Civ. P., among others, a rule that is designed to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).[1]  A Complaint may fail to state a claim either because what it asserts is not unlawful, or because the facts alleged do not give the defendants sufficient notice of the factual basis for the claim.  As the Third Circuit Court of Appeals has affirmed, "the Federal Rules do not require a claimant to set out in detail the facts upon which he bases his claim.  Rather, the complaint must only give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Thomas v. Independence Tp., 463 F.3d 285, 295 (3d Cir. 2006) (internal quotations and citations omitted).

Some facts, however, are necessary.  In order to give a

---

[1] The purpose of modern pleadings as being only to give fair notice of a claim of unlawful conduct was a deliberate change from the old code pleading standards which resulted in technical dismissals for failure to write the magic words.  See generally Charles Alan Wright, et al., 5 Fed. Prac. & Proc. Civ. § 1216 (3d ed.).  The modern rule provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

defendant fair notice, and to permit early dismissal if the complained-of conduct is not unlawful, a complaint must allege, in more than legal boilerplate, those facts about the conduct of each defendant giving rise to liability.  Twombly, 550 U.S. at 555; Fed. R. Civ. P. 11(b)(3).  These factual allegations must present a plausible basis for relief (i.e. something more than the mere possibility of legal misconduct).  See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1951 (2009).  Additionally, the Complaint may be required to add more factual specificity when qualified immunity is raised as a defense.  Thomas v. Independence Tp., 463 F.3d 285, 289 (3d Cir. 2006) (holding that when a lack of factual specificity in a complaint prevents the defendant from framing a fact-specific qualified immunity defense, the appropriate remedy is the granting of a defense motion for a more definite statement).

The distinction between a plausible claim and "mere possibility" is illuminated by Iqbal.  Relying on "judicial experience and common sense," and excluding conclusory allegations, the Supreme Court found the defendants' lawful explanation for the alleged conduct to be the "more likely" explanation, and therefore that the allegations of unlawful behavior were not sufficient to plausibly state a claim.  Id. at 1950-51.

In its review of Defendants' motion to dismiss pursuant to

Rule 12(b)(6), Fed. R. Civ. P., the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  The Court then determines whether these factual allegations meet the test set forth in Iqbal.

### B. Sufficiency of Allegations of Personal Participation

#### 1. Governor Corzine

The Complaint alleges that, at a minimum, Governor Corzine had actual knowledge of the speech restrictions and acquiesced in the enforcement of them.[2] (Compl. ¶ 76.)  After the Supreme Court's decision in Iqbal, there is some uncertainty over the continued existence of liability for a supervisor who knows about the unconstitutional conduct of subordinates and does nothing to stop it.  See Brickell v. Clinton County Prison Bd., 658 F. Supp. 2d 621, 625 (M.D. Pa. 2009).  Longstanding Third Circuit Court of Appeals precedent holds that supervisory personnel can be held

---

[2]  Plaintiffs also allege, in the alternative, that Governor Corzine personally created the restrictions that were relayed by his personal security team to Mr. Landgraf.  But when a Complaint being challenged for sufficiency alleges facts in the alternative, the Court must assess whether the allegations furthest from stating a claim are sufficient.  Otherwise a plaintiff could proceed on a claim of battery, for example, by alleging that the defendant did or did not punch him, which would not raise a plausible claim for relief.

liable under § 1983 if they had knowledge of and acquiesced in
subordinates' constitutional violations.  Id.  But Iqbal makes it
clear that there is no separate test for liability under § 1983
for supervisors; rather, each claim must satisfy the requirements
of individual liability for each defendant regardless of
supervisory position.  See Iqbal, 129 S.Ct. at 1948-49.  See also
Bayer v. Monroe County Children and Youth Servs., 577 F.3d 186,
191 (3d Cir. 2009) (noting uncertainty with respect to whether
knowledge and failure to act is sufficient for due process claim
after Iqbal and declining to address issue).

     A careful reading of Iqbal reveals that it does not
foreclose Plaintiffs' claim based on knowledge and acquiescence,
and therefore the alternative allegations in the Complaint are
sufficient.  While Iqbal did hold that elements of a § 1983 claim
cannot be imputed to a supervisor by way of respondeat superior,
it did not hold that acts or omissions regarding superintendent
duties can never state a claim.  This distinction is crucial.

     Iqbal involved allegations that a supervisor permitted a
policy to be executed that had discriminatory effects.  See
Iqbal, 129 S.Ct. at 1944.  The Supreme Court found that a non-
discriminatory intention, and not discriminatory animus, was the
more likely inference to be drawn from the supervisor's alleged
conduct.  Id. at 1951-52.  Consequently, merely permitting the
operation of the discriminatory policy did not state a claim

                              12

against the policymaker because there was no factual allegation
or reasonable inference regarding discriminatory purpose behind
that decision.  <u>Id.</u>

The allegations in <u>Iqbal</u> were insufficient to state a claim
under the Equal Protection clause, not because decisions made by
a supervisor with respect to whether certain policies will be
carried out cannot state a claim, but because that particular
claim requires not just acts or omissions that have
discriminatory effects, but also that the decisions be the
consequence of purposeful discrimination.  The requirement of
purpose in <u>Iqbal</u> flows from the nature of an Equal Protection
claim, rather than some general requirement of supervisory
liability.  <u>See</u> <u>Iqbal</u>, 129 S.Ct. at 1948.

Some free speech claims made against supervisors may
similarly require factual allegations regarding the supervisor's
discriminatory purpose, if the restriction is facially content-
neutral but the plaintiff claims that it has a viewpoint-
discriminatory purpose, for example.  <u>See</u> <u>Brown v. City of
Pittsburgh</u>, 586 F.3d 263, 270 (3d Cir. 2009) (describing inquiry
when facially content-neutral law may have been adopted for
discriminatory reasons).  Other free speech claims do not require
this kind of finding of discriminatory purpose, such as those
based on policies that facially discriminate based on content,
<u>see</u> <u>Rappa v. New Castle County</u>, 18 F.3d 1043, 1062 (3d Cir.

1994), but may require allegations regarding knowledge and intent when qualified immunity is raised.

Even for claims that require a finding of purpose, sometimes this finding is the only reasonable inference from the nature of the restriction, meaning that no separate factual allegation to support a finding of purpose is required. Such is the case here. Even if purpose is a necessary element of Plaintiffs' claims, the Governor's decision to permit the speech limitations reasonably raises the inference that the decision was taken with a discriminatory purpose because a very likely motivation for the policy was to prevent the speech of people who opposed the plan since the policy permitted the speech of Save Our State. It would be as if, in Iqbal, the plaintiffs had alleged that Ashcroft had implemented a policy of arresting only Arab Muslims who voted for Ralph Nader. In such a case, if not the only reasonable inference, certainly an extremely strong inference sufficient to state a plausible claim would be that this decision was taken because of, and not in spite of the protected political expression of the targets.

In summary, Iqbal does not abandon constitutional liability for supervisors' decisions regarding policies implemented by subordinates. The Supreme Court would not have made such a sweeping change to the law by implication. The case simply reiterates the longstanding distinction between supervisory

liability based on the discrete conduct of the supervisor that meets the requirements for the claim, and liability that is imputed to the supervisor solely by virtue of the supervisory position.  If a claim requires discriminatory purpose as well as discriminatory effect, then the plaintiff must allege facts sufficient to show that the supervisory decisions that resulted in the discriminatory effects were taken for a discriminatory reason.  And, in such cases, where a discriminatory purpose is a plausible inference from the facts, and in the absence of a "more likely" motivation to be inferred, then this obligation has been met.

Thus, the question with respect to the sufficiency of the allegations against Governor Corzine is not about his personal participation, since the allegation of knowledge and acquiescence is sufficient.  The question is whether the facts alleged raise a plausible claim that viewpoint discrimination motivated the restrictions, rather than some content-neutral motivation, a matter reviewed in Section III.C, <u>infra</u>.

### 2.  <u>Walter Landgraf</u>

Plaintiffs allege that they were initially stopped in the parking lot of the Performing Arts Center by Paul Fritch, a Middle Township policeman, who told them they could not display signs and distribute literature.  (Second Am. Compl. ¶ 66.)  When challenged about the policy, he told them to remain there while

he sought clarification.  (<u>Id.</u> ¶ 67.)  Officer Fritch found Mr.
Landgraf inside the Center, and together they returned to the
parking lot to inform Plaintiffs that Plaintiffs were not
permitted to enter the grounds of the Performing Arts Center.
(<u>Id.</u> ¶¶ 67-69.)  At some point, Mr. Landgraf walked away from the
group and consulted with the Governor's personal security detail.
(<u>Id.</u> ¶ 70.)  He returned to Plaintiffs and reiterated that they
would have to stop displaying signs and distributing literature
or leave the grounds.  (<u>Id.</u> ¶ 71.)

Mr. Landgraf argues that because he did not create the
speech restriction, he cannot be held personally liable for
relating its contents to Plaintiffs.  The Court agrees that the
Complaint does not allege that Mr. Landgraf created the policy.
But the Court sees no reason why it should follow that the
Complaint does not state a claim against Mr. Landgraf.  Section
1983 provides for liability for every person who "subjects, or
causes to be subjected," a citizen to the deprivation of
constitutional rights.  42 U.S.C. § 1983.  Plaintiffs allege that
Mr. Landgraf told them that they would have to stop displaying
signs and distributing literature or leave the grounds.  When two
of the Plaintiffs refused, they were arrested by the police
officers who accompanied Landgraf and sought his clarification of
the policy.  This is sufficient to raise a plausible claim that
Mr. Landgraf caused Plaintiffs to be subjected to restrictions on

16

their speech.

To the extent that Mr. Landgraf is arguing that a state actor may lawfully cause a citizen to be deprived of a constitutional right, so long as he did not create the unconstitutional restriction, this proposition is simply incorrect.  See J.H.H. v. O'Hara, 878 F.2d 240, 245 n.19 (8th Cir. 1989) (explaining that following orders is not a defense to § 1983 liability).  To the extent Mr. Landgraf's argument is about whether he would have known his conduct was unlawful, this is a question better addressed under qualified immunity.  Id.

## C.  Government Speech, Viewpoint Discrimination, and the Restriction on Signs and Leaflets

As the Court explained in its March 3, 2009 Opinion, it is appropriate to examine Plaintiffs' free speech claims collectively under First Amendment free speech doctrine, instead of separately as restrictions on speech, assembly, and petition.  See, e.g., Boos v. Barry, 485 U.S. 312, 319 (1988); Eichenlaub v. Township of Indiana, 385 F.3d 274, 281 (3d Cir. 2004).  Additionally, the New Jersey Supreme Court has instructed courts to "rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution."  Hamilton Amusement Center v. Verniero, 156 N.J. 254, 264 (1998) (citation omitted).  The Court will therefore treat all of the free speech

17

claims collectively, except to the extent that they involve different parts of the federal free speech doctrine (e.g., viewpoint discrimination, government speech, content-neutral restrictions).

Defendants maintain that they adopted the speech of Save Our State, transforming it into government speech.  Therefore, they argue, pointing to Save Our State's expressive activity does not help Plaintiffs to demonstrate the plausibility of their viewpoint discrimination claim, because the prohibition on Plaintiffs' activities was equally applied to all private speech, and justified by security concerns, see <u>Burnett v. Bottoms</u>, 368 F. Supp. 2d 1033, 1043 (D. Ariz. 2005) (describing constitutional security restrictions on free speech), as well as by the government's ability to express itself as the temporary rightful occupant of the public forum.  See <u>Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston</u>, 515 U.S. 557 (1995) (describing constitutional restrictions on speech of people with messages opposed to those of parade organizer).

As explained at greater length in the following sections, Defendants' argument is fundamentally flawed because it conflates two issues.  The premise of the argument is that by adopting Save Our State's speech, it not only transformed Save Our State's speech into government speech, it also eliminated any security or disruption risks posed by Save Our State's displaying of signs

18

and distributing of literature, such that the Court could find that those content-neutral rationales and not viewpoint-discrimination explained the restriction on Plaintiffs' identical behavior.

Even if the Court accepts the first transformation, it does not accept the second.  If the rationale for excluding Plaintiffs was that displaying of signs and distributing of literature, in and of themselves, pose a security risk or risk of disruption, regardless of the message they convey, then so do signs held and literature distributed by private citizens temporary enlisted as government speakers.  If Plaintiffs' signs and literature were excluded because of the message they conveyed, then that is viewpoint discrimination even if the speech of Save Our State is considered government speech.[3]


1.  <u>The State's Adoption of Save Our State's Speech</u>

Though it is not dispositive of this case, and so the Court does not hold it to be so, the Court assumes for the reasons given below that the State's ability to control its own message during time using a limited public forum extends to the ability

---

[3]  The Court acknowledges that the previous two opinions in this case focused the parties on the issue of government speech, as it appeared at the time to be a threshold issue for determining qualified immunity.  Upon further analysis, now that the Complaint is sufficient with respect to the factual allegations regarding personal participation, the issue of government speech turns out to be largely irrelevant.

to enlist private speakers to its cause, such that the private speaker's speech should be considered government speech.  Such selection of private speakers on the basis of viewpoint to present the government's message is not in itself unconstitutional viewpoint discrimination.

While the First Amendment ordinarily prohibits viewpoint-based restrictions on speech in a limited public forum,[4] the Free Speech Clause "restricts government regulation of private speech; it does not regulate government speech." Pleasant Grove City v. Summum, 129 S.Ct. 1125, 1131 (2009) (citing Johanns v. Livestock Marketing Assn., 544 U.S. 550, 553 (2005)).  A government speaker is free to express a viewpoint, and the government is also free to fund the expression of certain viewpoints based on their content.  Moreover, the government is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources.  Summum, 129 S.Ct. at 1131 (quoting Johanns, 544 U.S., at 562;); Rosenberger v. Rector and Visitors of University of Virginia, 515 U.S. 819, 833 (1995).

The difference between government adoption of private speech and unconstitutional favoring of private speech lies in the

---

[4]  The Court previously found that the auditorium in this case was a limited public forum, a subset of public fora created by designation.  See Eichenlaub v. Township of Indiana, 385 F.3d 274, 281 (3d Cir. 2004).  In such fora, subject-matter restrictions are permissible, but viewpoint-based restrictions are still unconstitutional.

nature of the relationship between the government and the speech. The case before the Court is not one in which the government is being viewpoint discriminatory in its role as gatekeeper of who gets to use the Middle Township auditorium as a limited public forum. Here, the auditorium remains open for Liberty and Prosperity 1776, or any other group, to reserve time to present their own message. Instead, this case involves choosing certain speakers to speak alongside the Governor when he personally uses the forum as the designated user. The circumstances of adoption of private speech at a government-sponsored rally affects the government speech analysis in two important ways that distinguish it from the case in which the government says from afar who may use the auditorium.

First, the dangers present in many of the difficult government speech cases are largely absent, or at least lessened under these circumstances. One major problem with the government speech doctrine is that it can be read to permit the State to engage in expressive activity without proper accountability. Pleasant Grove City v. Summum, 129 S.Ct. 1125, 1141-42 (2009) (J. Stevens, concurring) (expressing concern that too much expansion of the doctrine will allow the government to avoid political accountability). Government support of certain speech, by funding or preferential access to public fora, can shortcircuit political accountability mechanisms by permitting the government

to express a message through seemingly private speakers instead
of official mouthpieces.  This problem is of little concern where
the government enlists the aid of a private group to make the
same arguments the Governor himself is making at the same time on
stage.

A related potential danger of government speech doctrine is
that sub rosa sponsorship of speech can prevent citizens from
critically evaluating the speech knowing its true source.  Thus,
in addition to preventing citizens from holding the government
accountable for the speech, the audience's evaluation of the
content of the speech might change if it believed the speech came
from a private source.  It also permits the creation of a false
sense of private support for government policies.  This fear is
also largely allayed on the facts of the present case.  A
reasonable observer would conclude, or at least more readily
conclude than in other cases, that the speech was government-
sponsored given the large banner behind the stage, the
registration tables, and the Governor's personal funding of the
group.  And, indeed, according to Plaintiffs' allegations,
members of Save Our State genuinely supported the government
policy for their own political and economic reasons.

Second, when the government invites a private speaker to
join it as it uses a limited public forum like a private speaker
would, it exercises a degree of control over the content of the

message that the Supreme Court has found important in
distinguishing government from private speech.  Johanns v.
Livestock Mktg. Ass'n, 544 U.S. 550 (2005) (relying on the
government control as the distinguishing characteristic of
government speech in that case).  The Court takes as true for the
purposes of this motion that the State of New Jersey did not
create, fund, or control Save Our State, and that it was created,
funded, and controlled by private interests for the sole purpose
of engaging in political advocacy in furtherance of its
individual donor's political and economic interests.  The Court
also assumes that the State of New Jersey exercised no control,
even by informal agreement, over the content of Save Our State's
expressive speech.  However, the government can exercise control
by selecting certain private expressions to take as its own.  In
Summum, the city controlled its message because it exercised
"final approval authority" over the monuments.  Id. at 1134
(quoting Johanns, 544 U.S. at 561).  Save Our State's sole
purpose was to support the Governor's policy, so selection of the
group to help get out the government's message at the public fora
is, in effect, control over the message in the same way that
selection of a monument is control over the message.

   It therefore appears to the Court that the Government may
express a viewpoint during its time using a limited public forum
in the same way a private speaker can, and may do so by inviting

a nonprofit group to speak alongside it.  In the context of
inviting that speech alongside the Governor's message at a town
hall meeting, the government was soliciting assistance from a
nongovernmental source to express a message it controlled — if
only by selection — and which does not implicate many of the
problems associated with government speech doctrine.

      2.  <u>Boundaries of Preferential Treatment of Government
Speech In a Limited Public Forum</u>

Superficially, the government is only asking for the same
accommodation for its speech activity to which any private group
using the auditorium for civic purposes is entitled: the right to
present its views on an issue uninterrupted by another group's
interference.  According to this rationale, some degree of
preferential treatment for speech adopted by the government is
also permissible.  The Governor could, for example, invite the
President of Save Our State to introduce him at the meeting
without also permitting Liberty and Prosperity 1776 to give some
opening remarks.  As in this case, the Governor could also hang
the Save Our State banner above the stage, and perhaps permit
only Save Our State to set up registration tables.[5]

_____

[5]  The ability to control the government's own speech would
also not extend to the ability to censor dissenting views during
that portion of the government's agenda that involves soliciting
public views.  <u>See</u> <u>Monteiro v. City of Elizabeth</u>, 436 F.3d 397,
405 (3d Cir. 2006) (upholding denial of qualified immunity upon
summary judgment where a jury could find that public official

However, in this case, the State is actually asking for something more than what a private speaker would be entitled to: the ability not just to control its own speech and prevent disruption, but the ability to exclude even peaceful, non-disruptive dissent that does not confuse or impair the government's message.  There is no justification for this greater power.

The discriminatory treatment of who may hang a banner on the stage is permissible because the existence of a limited public forum does not itself give any speaker the right to get up on stage during another speaker's time, or to otherwise become a part of the organizing speaker's message.  The government's adoption of some private speaker to form part of its message does not expand the scope of the limited public forum.  But while the government's adoption of private speech does not expand the right of other private speakers to speak in the forum, it also does not restrict those rights.  Even when an entity, government or private, has reserved time in a limited public forum for a meeting open to the public, it may not restrict the peaceful, quiet holding of signs or distribution of literature.

In Startzell v. City of Philadelphia, 533 F.3d 183 (3d Cir.

"acted with an intent to suppress [plaintiff's] speech on the basis of viewpoint" at city council meeting).  The Court does not understand Plaintiffs to allege that they could not express their views verbally during the period of the town hall meeting reserved for that public discourse.

2008), the Court of Appeals affirmed the longstanding principle that a private user of a public forum, chosen through otherwise constitutional means (i.e. some kind of content-neutral permit system), has some power to control the message conveyed, a power appropriately backed by government enforcement.  Id. at 198.  In Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557 (1995), the Supreme Court unanimously held that a state may not require private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey.  Similarly, organizers of a rally that is open to the public in a limited public forum need not allow other groups to display posters on the stage, or otherwise express messages that interfere with the message being conveyed by the organizers.

But the Court of Appeals also held that this legitimate exercise of government power does not extend to the exclusion from the forum of those who hold signs and distribute literature with messages of dissent.  Id. at 199.  It is only "when protestors move from distributing literature and wearing signs to disruption of the permitted activities" that the organizers may call upon state power to remove the disrupting party.  Id.

It does not follow from Hurley or its logic that the rightful temporary occupier of the limited public forum may exclude from the forum all competing messages of any kind,

regardless of whether they would interfere or be confused with the speech of the organizer.  Startzell distinguished Hurley in the situation in which, at an event otherwise free and open to the public, individuals with the competing message did not seek to use stage area or set up a vendor booth or otherwise do anything that would cause event attendees to believe the organizers might endorse the competing group's message, or confuse or disrupt the organizer's message.  See also Gathright v. City of Portland, 439 F.3d 573 (9th Cir. 2006); Parks v. City of Columbus, 395 F.3d 643 (6th Cir. 2005).  Startzell also distinguished cases that had held that a government-sponsored rally may exclude dissenting speech, because in those cases the events were not open to the public.  533 F.3d at 193 n.7.

The result in Startzell is not altered when the State, and not a private party, is the organized speaker in the public forum.  The Court has no reason to believe the government's power should be greater than that of a private speaker in these circumstances.  The Third Circuit's opinion in Startzell cites approvingly an Eighth Circuit case, Wickersham v. City of Columbia, 481 F.3d 591 (8th Cir. 2007).  Startzell, 533 F.3d at 195.  The Court in Wickersham reasoned that Hurley did not apply to a state actor who organized an air show where it "has not shown that its message was dependent upon the composition of the crowd at the air show" or that appellants' signs and leaflets

27

were likely to be identified with it.  Wickersham, 481 F.3d at 600.

Holding signs and distributing leaflets at a state-sponsored rally is not the same as directly participating in the message being expressed in the rally.  And therefore the right of the government to control its message does not extend to control over that dissenting speech.

It may be that holding up signs and distributing literature can become disruptive, entitling the organizers of an event in a limited public forum to exclude those disruptive individuals.  But a blanket ban on such conduct cannot be justified by a general belief about disruption.  Indeed, at this stage, the Court need only find that viewpoint discrimination, and not disruption, is a plausible inference from the facts, and that a motivation to avoid disruption is not a "more likely" explanation.  Even if the Court thought it likely that signs opposing the plan were more disruptive than signs supporting it, there is no plausible justification to be found in the government's ability to control its own speech or prevent disruption for restricting Plaintiffs from holding up signs and distributing leaflets on the facility grounds outside the auditorium.

The Court holds that when the government convenes a town hall meeting that is generally open to the public, its perogative

to adopt the speech of private speakers and control its message does not extend to limitations to which private speakers would not be entitled, such as preventing members of the public from peaceably holding up signs of distributing leaflets expressing disagreement, except to the extent these limitations are justified by security concerns, discussed below.

### 3.   Security Rationale

Of course, one significant difference between the government as temporary user of a limited public forum and a private speaker, is that the government may have greater security interests in preventing audience activities.  The security rationale can, in some cases, serve as a content-neutral basis for a restriction on the expressive behavior of members of the Governor's audience that would not be justified when the speaker is someone else.  See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (explaining content-neutral restrictions on the time, place, and manner of speech); Burnett v. Bottoms, 368 F. Supp. 2d 1033, 1043 (D. Ariz. 2005) (describing constitutional security restrictions).  In support of the security rationale, Defendants argue that "[s]igns can serve as and can conceal weapons; and both signs and literature can arouse passions in a surreptitious way that verbal speech often cannot."  (Def.'s Br. Supp. First Mot. to Dismiss, at 12-13).  On this motion to dismiss, to show

29

that Plaintiffs have no plausible claim that the speech
restriction is unconstitutional, Defendants must show that the
security rationale was both "more likely" than viewpoint
discrimination to be the actual reason the restrictions were
imposed, according to judicial common sense, see Iqbal, 129 S.Ct.
at 1950-51, and that these content-neutral restrictions are
otherwise lawful.   See Ward v. Rock Against Racism, 491 U.S. 781,
791 (1989) (explaining doctrine of content-neutral speech
restrictions).

     The Court finds that based on these factual allegations in
the Complaint, the security justification was not a more likely
explanation for the restrictions than viewpoint discrimination.
The notion that signs are more surreptitious than verbal speech,
and that this raises the security risk associated with signs, is
questionable, to say the least.  More importantly, Defendants
never explain why the characterization of Save Our State's
expressive activity as government speech means that the same
security interest does not apply to the private citizens who were
members of that group who brought signs and distributed leaflets.
The Court does not presume to judge what is and what is not a
security threat, and what actually motivated the restrictions
before a factual record is developed; the question is just
whether this alternative explanation for the restrictions seems
more likely, and at this stage it does not.  A person with plans

for violence could just as easily volunteer for Save Our State as for Plaintiffs' organization.  A decision to trust the peaceful intentions of the members of one group may not mandate such trust for all others, but something beyond the bare assertion of a security justification is needed where the only difference between the groups seems to be the content of their speech.

If security were the real motivation behind the restriction at issue here, such a rationale must still be otherwise content-neutral and "narrowly tailored to serve a significant governmental interest."  Thomas v. Chicago Park Dist., 534 U.S. 316 (2002) (internal quotations omitted).  Even assuming the exemption for Save Our State did not undermine the content-neutrality of the restriction, it might still fail to be content-neutral if the security rationale is based on the speech that the officials expected might "arouse passions."  The arousal of passions is precisely the point of political speech, not a basis for its restriction.  And as to narrow tailoring, a complete ban on both signs and leaflets being distributed even outside the auditorium may not be justified by a belief that certain kinds of signs might be used as weapons (presumably ones attached to sticks).  Again, the Court does not prejudge the evidence that Defendant might be able to adduce to support the security threat posed by the distribution of leaflets outside the auditorium, but it is no so obviously a security threat at this stage so as to

31

warrant dismissal.

Because the exclusion of Plaintiffs based on fears about security does not seem "more likely" based on the facts alleged than Plaintiffs' contention that the real justification for the restriction was Plaintiffs' viewpoint, and because in this context the security justification does not appear to meet the requirements of content-neutral restrictions, dismissal based on Defendants' argument that security was the real rationale for restricting Plaintiffs' signs and leaflets, even outside the auditorium, is inappropriate at this stage.

   4. <u>Summary</u>

If it were the case that it was the permitting of Save Our State to speak that made the auditorium a limited public forum for the display of signs and distribution of literature, then the inquiry into whether Save Our State's speech constituted government speech would be crucial.  But the auditorium was a limited public forum because it is a public school auditorium being used for an event open to the public, not because of the State's permitting Save Our State to display signs and distribute leaflets.

In testing the plausibility of Plaintiffs' allegations, the question is therefore about the scope of Plaintiffs' right to free speech in such a limited public forum.  Even if the Court

were to view Save Our State's speech as government speech for the
purpose of analysis, as Defendant asks the Court to do, the
question is whether the allegations contained in the Complaint
plausibly allege that Plaintiffs were excluded from the limited
public forum because of their viewpoint, or whether the Complaint
fails to state a claim because the "more likely" explanation is
that Plaintiffs were excluded based on a content-neutral
regulation.  See Iqbal, 129 S.Ct. at 1951.   The Complaint meets
this requirement of plausibility.  It raises a plausible claim,
not because the government selected some private speech to adopt
and not other speech — a decision the Court assumes was
constitutional — but because permitting the members of Save Our
State to display signs and distribute literature undermines the
Defendants' argument that the restrictions were part of a
content-neutral scheme to enhance security and prevent
disruption.  The Complaint is sufficient to raise a plausible
claim that neither security nor fear of disruption were the
reasons for excluding Plaintiffs.


### D.  Qualified Immunity

As an "accommodation of competing values," qualified
immunity strikes a balance by permitting a plaintiff to recover
for constitutional violations where a governmental defendant was
"plainly incompetent or . . . knowingly violate[d] the law,"

33

while immunizing a state officer who "made a reasonable mistake about the legal constraints on his actions." Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and citations omitted).

The Court's assessment of whether a defendant is entitled to qualified immunity hinges on two considerations.  The Court must determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." Id. (citation omitted).  This is the analysis completed above in Part III.C.  Having found such an allegation of a deprivation, the Court must address "whether the right that was [allegedly] violated was clearly established, or, in other words, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (internal quotations and citations omitted).

Because the inquiry into what a reasonable officer could have believed was lawful depends on the conduct in question and the facts known to the officer, the Court examines the question separately for the two moving Defendants.


        1.  Governor Corzine

If the lawfulness of the speech restriction in this case turned on whether Save Our State was expressing government or private speech, the Court would agree that Governor Corzine would be entitled to qualified immunity.  There is no clear standard

34

guiding the determination of whether particular speech constitutes government or private speech. Pleasant Grove City v. Summum, 129 S.Ct. 1125, 1139 (2009) (J. Stevens, concurring) ("[O]ur decisions relying on the recently minted government speech doctrine to uphold government action have been few."); Note: Strict Scrutiny in the Middle Forum, 122 Harv. L. Rev. 2140, 2154 (2009)("[T]he distinctions the Supreme Court has drawn between when the government itself has spoken and when it has merely facilitated private expression are subtle at best."); Helen Norton, The Measure of Government Speech: Identifying Expression's Source, 88 B.U. L. Rev. 587, 588-91 (2008) (detailing the many conflicts and circuit splits on the distinction between government and private speech).  To the extent there is a test at all, see, e.g., Planned Parenthood Of South Carolina Inc. v. Rose, 361 F.3d 786 (4th Cir. 2004), the Third Circuit has yet to adopt it.[6]

But, as explained at length in Part III.C, even assuming Save Our State's expressive conduct was government speech, that does not explain why a reasonable official would have thought it was lawful to restrict Plaintiffs from carrying signs and handing

---

[6]  The Fourth Circuit's test examines "(1) the central purpose of the program in which the speech in question occurs; (2) the degree of editorial control exercised by the government or private entities over the content of the speech; (3) the identity of the literal speaker; and (4) whether the government or the private entity bears the ultimate responsibility for the content of the speech."  Id. at 792-93.

out leaflets on the grounds of the Performing Art Center.

Whether Governor Corzine is entitled to qualified immunity turns on a questions of fact regarding his purpose in ordering or permitting the speech restriction. And when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury. See Johnson v. Jones, 515 U.S. 304, 313 (1995). If the Governor's purpose was, as Plaintiffs plausibly allege, to suppress speech containing dissenting viewpoints, then Governor Corzine would not be entitled to qualified immunity because he could not have reasonably believed that viewpoint discrimination was lawful under existing precedent. As this Court held in the previous opinion in this case, it is clearly established First Amendment law that the state may not impose limitations on citizens' speech at the town hall meeting based solely on the viewpoint of that speech in the absence of a state interest that would survive strict scrutiny. See Monteiro v. City of Elizabeth, 436 F.3d 397, 405 (3d Cir. 2006) (upholding denial of qualified immunity upon summary judgment where a jury could find that public official "acted with an intent to suppress [plaintiff's] speech on the basis of viewpoint" at city council meeting).

Governor Corzine is free to move to restrict discovery to the facts relevant to the resolution of this question before moving to general discovery, but he is not entitled to dismissal

36

at this stage based on the argument.

      2.  <u>Mr. Landgraf</u>

     The above analysis applies equally to Mr. Landgraf.
However, Mr. Landgraf's position might be different for the
purpose of qualified immunity, because he did not necessarily
know about the full scope of the restrictions, and was just doing
what he was told.  Generally, an official who is entitled to
qualified immunity can claim it if the alleged conduct was
prescribed by orders or regulations and the official had no
reason to know he was violating plaintiff's constitutional
rights.  See <u>Schatz v. McCaughtry</u>, 87 F.3d 1316 (7th Cir. 1996)
(citing <u>J.H.H. v. O'Hara</u>, 878 F.2d 240, 244 n. 4 (8th Cir. 1989).
The Court does not reach the question of whether Mr. Landgraf,
based on the Complaint's allegations, knew or should have known
that his conduct was violating Plaintiffs' constitutional rights,
however.

     Mr. Landgraf attempts to raise qualified immunity without
any explanation of his official duties.  Apart from the question
of the scope of qualified immunity in any given case, a separate
question is whether a given official is entitled to qualified
immunity at all.  Generally, state officials "performing
discretionary functions" are entitled to qualified immunity.
<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Whether an

official related to the Board of Education is "performing discretionary functions" when enforcing the security requests of the governor's security detail at a town hall rally is not so obvious as to require no further support from the individual asserting the defense.  If such an action is not within his discretionary functions, there is no need to shield him from liability as the need not perform that function in his duties as a government official.  Cf. Jones v. City of Atlanta, 192 Fed. App'x 894 (11th Cir. 2006) ("A government official acts within her discretionary authority if the actions were (1) undertaken pursuant to the performance of her duties and (2) within the scope of her authority.") (internal citation omitted).

       The Court cannot determine without more facts whether Mr. Landgraf is entitled to qualified immunity for his actions on the day in question.  These are facts within Mr. Landgraf's, and not Plaintiffs' control.  The motion is therefore denied with respect to Mr. Landgraf without prejudice to a future similar motion that explains why he is entitled to qualified immunity.

## IV.  CONCLUSION

       The fact that Save Our State was allowed to speak in the auditorium is not fatal to Defendants claims regarding the content-neutral exclusion of Plaintiffs, because Defendants may still be able to show that they excluded Plaintiffs for content-neutral reasons.  But it does make plausible Plaintiffs' claim

that viewpoint discrimination and not security or the prevention of disruption was the basis of the suppression of Plaintiffs' speech.  The Complaint adequately states a claim against both Defendants for their involvement in the enforcement of this restriction.  It states a claim against the Governor because it alleges sufficient facts to make it plausible that the Governor either personally ordered the restriction or at least made a discriminatory decision to permit others to exclude speakers opposed to his policy from the town hall.  It states a claim against Mr. Landgraf because it alleges that he personally enforced the restriction in his official capacity as a public official.  The Court cannot determine whether qualified immunity protects the Defendants' conduct because the facts necessary for that determination are disputed or have not yet been supplied, and dismissal on grounds of qualified immunity is denied without prejudice, as explained above.  The accompanying Order will be entered.


**June 24, 2010**                          **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            United States District Judge